UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

UNITED STATES OF AMERICA,                                      Plaintiff,

v.                                         Criminal Action No. 3:19-cr-63-DJH

GARRICK MATTHEWS,                                          Defendant.

\* \* \* \* \*

## MEMORANDUM OPINION AND ORDER

Defendant Garrick Matthews is charged with two counts of being a felon in possession of a firearm. (Docket No. 1) The charges arise from arrests of Matthews following traffic stops on April 6, 2018, and December 9, 2018. (*Id.*) Matthews argues that the stops and the subsequent searches of the vehicles were unconstitutional. (D.N. 37) He has moved to suppress evidence obtained from those stops, claiming that any such evidence is the fruit of an illegal search. (*Id.*, PageID # 72) The Court held an evidentiary hearing on the motion to suppress on August 27, 2019. (D.N. 46) For the reasons explained below, Matthews's motion to suppress will be denied.

### I. April 6, 2018, Traffic Stop

This case arises out of two separate traffic stops and searches of automobiles driven by Matthews. (D.N. 47, PageID # 97) The Court will address each one in turn.

On April 6, 2018, Officers Brenton Woodford and Rex Kelly of the Louisville Metro Police Department stopped Matthews on South Preston Street. (D.N. 51, PageID # 218) Woodford testified that he stopped Matthews because Matthews ran through a stop sign and because Woodford saw him go by at a high rate of speed. (D.N. 47, PageID # 105) Specifically, Woodford testified that at the intersection of West Ormsby and South Preston Street, all four tires of Matthews's vehicle were past the white "stop bar." (*Id.*)

1

Once Matthews pulled his car over, Woodford approached from the driver's side and Kelly approached from the passenger's side. (*Id.*, PageID # 106) The bodycam video shows that as Woodford approached the car, Matthews said, "I'm running out of gas man." (D.N. 49-10, 00:44) Woodford asked Matthews if that was why he was traveling so fast. (*Id.*, 00:53) When Woodford reached the driver-side door, Matthews was leaning out of the car window with his right arm on the window frame of the driver's door and his chest turned toward Woodford. (*Id.*, 00:57) Woodford asked Matthews for his driver's license. (*Id.*, 01:11) Matthews responded that he did not have his driver's license, but he stated that his first name was Terrance and provided "07/29/83" as his date of birth. (*Id.*, 01:11-51) Matthews also stated that he could not remember his social security number. (*Id.*, 01:46) This information later turned out to be false; as discussed below, Matthews eventually told the officers his real name and his social security number. (D.N. 47, PageID # 99; D.N. 49-10, 23:35-24:22)[1] Meanwhile, Kelly shined his flashlight into the vehicle from the passenger-side window, illuminating a long, thin brown item in the ashtray adjacent to the glove compartment. (D.N. 49-11, 00:54-56) Kelly motioned for Matthews to roll down his window and then shined his flashlight on the item again multiple times. (*Id.*, 01:08-52)

Once Woodford finished taking down Matthews's information, the two officers walked back to Woodford's police car. (D.N. 49-10, 02:49) Kelly asked Woodford, "Did you see that joint right there in the ashtray?" and later remarked that "it look[ed] like there was a joint right there in the little ashtray." (D.N. 49-11, 2:35-54) Kelly also stated that Matthews was "floating

---

[1] Woodford testified at the evidentiary hearing that he was ultimately able to figure out "exactly who [Matthews] was" by submitting Matthews's correct information into the CourtNet system. (D.N. 47, PageID # 121)

too."[2]  (*Id.*, 03:15) As Woodford tried to check Matthews's identity, the two officers continued discussing the fact that Matthews was "floating."  (D.N. 49-10, 03:36-53; D.N. 47, PageID # 121)

After Woodford was not able to get any information on "Terrance Matthews," the officers re-approached the vehicle.  (*Id.*, 04:27-05:09)  When Kelly reached the passenger-side window, he shined his flashlight on the item in the ashtray again and asked if Matthews had anything else in the car "besides that weed right there" and whether he had "anything else besides that joint." (D.N. 49-11, 05:22-28)  Matthews did not respond because he was arguing with Woodford, asking the officers why they pulled him over.  (D.N. 49-10, 05:19)  Woodford responded that Matthews was "all over the top" of the stop sign bar, and that Matthews was also "floating down that street too on top of it."  (*Id.*, 05:23-35)  Matthews responded that he did not run any stop sign.  (*Id.*, 05:55)  As they argued, Woodford asked Matthews several times to exit the vehicle.  (*Id.*, 05:42-08:31)  Matthews remained inside the vehicle and continued asking what he did wrong, while Woodford answered several times that he saw Matthews run a stop sign.  (*Id.*)  As Matthews continued to argue with the officers about having to get out of his car, Woodford informed Matthews that they also saw that he had a marijuana joint in his car.  (*Id.*, 08:17)  Matthews tried to show them the item, saying "it's a cigarette."  (D.N. 49-11, 08:04)

Eventually the officers pulled Matthews out of the car, placed him against the side of the vehicle, and handcuffed him.  (D.N. 49-10, 08:30-49)  The officers then put Matthews behind his car while Kelly began searching the car, uncovering a handgun in the area between the driver's seat and the armrest and cupholders, and an unlabeled yellow pill bottle in the armrest.  (*Id.*, 08:50; D.N. 49-11, 08:40, 09:04-10:16)  Matthews protested when Kelly searched his car, but Woodford

---

[2] Officer Woodford explained at the evidentiary hearing that "floating" means an individual was speeding.  (D.N. 47, PageID # 122)

informed him that the marijuana they saw gave them probable cause to search the vehicle.  (D.N. 49-10, 09:24-29)  Matthews stated that the "marijuana" was a cigar.  (*Id.*, 09:30)

While Kelly continued searching the vehicle, Woodford placed Matthews in the backseat of a police car.  (*Id.*, 09:42)  Woodford again explained to Matthews that he was pulled over because his car was over the white stop line, and that if a car is "over top of that, you've run the stop sign."  (*Id.*, 10:20-25)  Matthews maintained that his car was not over the line.  (*Id.*, 10:25) He also started to tell Woodford "there's a blunt in the—" but was interrupted.  (*Id.*, 10:37) Matthews also told Woodford to "run the name on the gun, it's mine," (*id.*, 10:53), though he later told the officers that the gun was his wife's and that he did not know it was in the car.  (*Id.*, 25:37-52)

With regard to the item found in the ashtray, Matthews repeatedly told Woodford "it's a blunt."  (*Id.*, 12:47, 12:54)  Matthews later said that instead of a blunt, the item was "a cigar [with] tobacco in it" and asked the offers to "open it up" because there was "tobacco in there."  (*Id.*, 14:07-13)  Woodford asked if the item was a marijuana blunt, and Kelly picked the item up from the hood of the police car, put it up to his nose, and nodded.  (*Id.*, 14:16-19)  Woodford then picked up the blunt himself, inspected it, and said "Yeah, weed" followed by "I think we know what a blunt looks like."  (*Id.*, 15:38-42)

Matthews now asserts that the officers had no probable cause to stop him or remove him from the vehicle and conduct a search because the "blunt" seen during the stop was a "Philly blunt cigar, a legal item sold in most every gas station and convenience store" (D.N. 47, PageID # 103); the dashboard and body cameras activated in conjunction with the stop do not show the alleged traffic violations (D.N. 51, PageID # 218); when the dash footage begins, the car is moving and the back two tires are still not across the white stop line (*id.*, PageID # 221); there is reason to

doubt Woodford's credibility as he testified that all four tires were past the line (*id.*); and there was no allegation Matthews was traveling in excess of the speed limit. (*Id.*, PageID # 222)

The government argues that the officers had probable cause to stop Matthews because he ran a stop sign and was driving at a high rate of speed. (D.N. 47, PageID # 97, 121) The United States also asserts that the officers had probable cause to search the vehicle because they observed a marijuana blunt in the ashtray of the vehicle and also smelled it. (D.N. 50, PageID # 199)

## A. Probable Cause to Stop

The first question is whether the officers violated Matthews's Fourth Amendment rights when they performed a warrantless stop on April 6, 2018. "The Fourth Amendment provides that, [t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable seizures, shall not be violated . . . ." *Camera v. Mun. Ct. of San Francisco*, 387 U.S. 523, 528 (internal quotations omitted). "An ordinary traffic stop by a police officer is a 'seizure' within the meaning of the Fourth [and Fourteenth] Amendment[s]." *United States v. Blair*, 524 F.3d 740, 748 (6th Cir. 2008) (alteration in original). "The warrantless stop of an automobile will be reasonable under the Fourth Amendment if the police have probable cause to believe that a traffic violation occurred." *United States v. Bachelor*, No. 3:15-CR-0005-CRS, 2015 U.S. Dist. LEXIS 162157, at *14 (E.D. Ky. Oct. 8, 2015) (quoting *Whren v. United States*, 517 U.S. 806, 810 (1996)). As long as the stop of the vehicle is found to be objectively reasonable, the subjective motive of the officers involved in the traffic stop is not relevant to the Court's constitutional inquiry. *See United States v. Herbin*, 343 F.3d 807, 809-10 (6th Cir. 2003) ("From beginning to end the constitutionality of a traffic stop under the Fourth Amendment depends upon the objectively reasonable justifications for the officer's actions, not their subjective intentions.").

"A traffic stop is allowable if officers have probable cause that the motorist violated the law—and even a minor traffic violation provides probable cause for a traffic stop." *United States v. Parker*, 17 F. Supp. 3d 667, 670 (W.D. Ky. 2014) (citing *Whren*, 517 U.S. at 812-13; *United States v. Ferguson*, 8 F.3d 385, 391 (6th Cir. 1993) (en banc), *cert. denied*, 513 U.S. 828 (1994)). In analyzing the reasonableness of a traffic stop, the Court asks "whether the police officer possessed probable cause or reasonable suspicion to believe that a traffic violation occurred, not whether a traffic violation in fact occurred." *United States v. Sanford*, 476 F.3d 391, 396 (6th Cir. 2007). "[S]o long as the officer has probable cause to believe that a traffic violation has occurred or was occurring, the resultant stop is not unlawful and does not violate the Fourteenth Amendment." *United States v. Bradshaw*, 102 F.3d 204, 210 (6th Cir. 1996) (citing *Ferguson*, 8 F.3d at 391).

In determining whether officers had probable cause for a stop, courts look to whether the officers had "reasonable grounds for [their] belief [that a violation occurred], supported by less than prima facie proof but more than mere suspicion." *United States v. Copeland*, 321 F.3d 582, 592 (6th Cir. 2003). "A court must determine whether 'the facts and circumstances within [the officers'] knowledge and of which [they] had reasonable trustworthy information [were] sufficient to warrant a man of reasonable caution in the belief that' an offense has been or is being committed.'" *United States v. Hughes*, 606 F.3d 311, 320 (6th Cir. 2010). The probable-cause standard is objective; "[s]ubjective intentions play no role in probable cause Fourth Amendment analysis." *Schneider v. Franklin Cty.*, 288 F. App'x 247, 251 (6th Cir. 2008). The relevant inquiry in traffic-stop cases is "whether this particular officer in fact had probable cause to believe that a traffic offense had occurred, regardless of whether this was the only basis or merely one basis for the stop." *Ferguson*, 8 F.3d at 391.

Matthews contends that the officers did not have probable cause to stop him on April 6, 2018, because neither of the alleged traffic violations is shown on the dashcam or bodycam recordings and because there is "ample reason to doubt" Woodford's credibility. (D.N. 51, PageID # 219, 221) The government first argues that Matthews disregarded a stop sign in violation of applicable state law (D.N. 50, PageID # 202), which provides that

> [e]xcept where directed to proceed by a police officer, every operator of a vehicle approaching a stop sign shall stop at a clearly marked stop line but, if none . . . then at the point nearest the intersecting roadway where the operator has view of approaching traffic on the intersecting roadway before entering it.

Ky. Rev. Stat. § 189.330(4). Matthews argues that when the dashcam footage begins, the two back tires of the vehicle had not crossed the white stop line and that § 189.330(4) only requires that a vehicle stop "at" the stop line, not "before" it. (D.N. 51, PageID # 221) The Court finds, however, that the defendant failed to stop properly. His front tires were past the white bar, and the defendant points to no authority—and the Court can find none—which suggests that the violation only attaches when all four tires extend past the white line.

While Woodford testified that all four tires were past the stop bar (D.N. 47, PageID # 105), the vehicle's back two tires are still on the white stop line and the car is in motion when the dashcam footage begins. (*Id.*, PageID # 126; D.N. 49-13, 00:00-00:02) Woodford testified, however, that the camera automatically starts 30 seconds after the police vehicle's sirens and lights turn on. (*Id.*, PageID # 126) He explained that the camera would therefore not go back more than 30 seconds to see if Matthews was stopped just before the camera turned on. (*Id.*) Further, the dashcam footage shows that Matthews was driving a large SUV and the vast majority of the car was over the white stop line—with the back two tires almost entirely over the line—when the footage begins. (D.N. 49-13, 00:00-00:02) Therefore, although Matthews argues that the dashcam footage is inconsistent with Woodford's testimony, the Court finds that the footage is not

dispositive because it picks up in progress. This leaves the Court with Woodford's unrebutted testimony that he saw Matthews run the stop sign.[3] (D.N. 47, PageID # 105) Woodford was traveling directly behind Matthews and testified that he observed Matthews's failure to stop firsthand. (*Id.*) As the Court finds Woodford's testimony on this point to be credible, the officers had probable cause to believe Matthews committed a traffic violation when he failed to properly stop at the stop line on April 6, 2018.

In any event, the officers also observed Matthews speeding in violation of Kentucky law, which provides that an "operator of any vehicle upon a highway shall operate the vehicle in a careful manner, with regard for the safety and convenience of pedestrians and other vehicles upon the roadway." Ky. Rev. Stat. § 189.290. Matthews argues that the alleged "high rate of speed" was never established and that the officers never informed him of the speed limit or alleged that he was driving in excess of the speed limit. (D.N. 51, PageID # 222) Although Matthews insists that he was not driving recklessly (*id.*, PageID # 218), the Court finds that the testimony of Officer Woodford on this point is credible.

Woodford testified that he saw Matthews go by at a high rate of speed. (D.N. 47, PageID # 105) The minor discrepancy in the exact location is not enough for the Court to discredit the testimony of Woodford as he testified that Matthews was speeding "down Jackson Street" (*id.*,

---

[3] As explained above, the Court finds the dashcam footage inconclusive. The Court therefore finds Officer Woodford's general testimony that Matthews ran the stop sign, as opposed to his specific testimony that all four wheels were over the stop line, to be unrebutted. Matthews argues that Woodford's general testimony is contested because the bodycam footage shows that the alleged traffic violations "were strongly disputed" by Matthews. (D.N. 51, PageID # 222) Matthews did not take the stand, however, and did not provide any testimony or other evidence to rebut Woodford's testimony beyond the self-serving statements on the bodycam footage. (*See* D.N. 47) Counsel for Matthews offers arguments, not evidence, and Officer Woodford's testimony is therefore unrebutted. *See Bickett v. Countrymark Energy Res., LLC*, 250 F. Supp. 3d 309, 320 (W.D. Ky. 2017) (noting that "argument of counsel is not evidence" (citing *Hinds v. Sprint/United Mgmt. Co.*, 523 F.3d 1187, 1198 n.6 (10th Cir. 2008))).

PageID # 105), while the arrest report stated that the vehicle was speeding as it crossed *over* Jackson Street. (D.N. 49-1) Further, the contemporaneous statements and reactions of the officers as shown on their bodycam recordings support Woodford's testimony. (*See* D.N. 49-10, 00:53-57 (Matthews states he is running out of gas, and Woodford asks if that is why Matthews was going so fast); 03:36 (Kelly states that Matthews was "floating"); 03:35-53 (officers continue to discuss how Matthews was "floating"); 5:35 (Woodford tells Matthews that he was "floating down that street too")) The citation issued to Matthews on April 6 listed reckless driving among the offenses, and Woodford explained at the hearing that he cited Matthews for reckless driving because Matthews was speeding. (D.N. 47, PageID # 121) These types of contemporaneous statements and actions are less likely to be feigned. *See United States v. Conway*, No. 17-43-DLB-CJS, 2018 U.S. Dist. LEXIS 119929, at *21-*22 (E.D. Ky. June 4, 2018) (finding the search of a vehicle constitutional after body camera recordings showed contemporaneous statements and reactions from the officers supporting their testimony). As Woodford's testimony is consistent with the bodycam footage of the officers, the Court finds the testimony credible.

In sum, the Court finds that the officers were permitted to detain Matthews's vehicle on April 6, 2018, because they had probable cause to believe Matthews committed two traffic violations. *See United States v. Burton*, 335 F.3d 514, 516 (6th Cir. 2003) (citing *Whren*, 517 U.S. at 812-13 ("The Fourth Amendment . . . permits an officer who has probable cause to believe that a traffic violation is occurring to detain the automobile, regardless of the officer's subjective motivation for the stop.")).

**B.     Probable Cause to Search Defendant's Vehicle and Seize Items**

Matthews challenges the legality of the April 6, 2018, search, maintaining that he did not have access to anything inside the vehicle and that the officers had no reason to believe the vehicle

had proof of the offense for which Matthews was stopped—a traffic violation. (D.N. 51, PageID # 224) He also contends that the alleged marijuana cigar contained only tobacco, and that there was no reference to the smell of marijuana prior to the search. (*Id.*) He argues that the facts do not support the government's assertion that the officers had probable cause to believe evidence of a drug offense would be located inside the vehicle. (*Id.*, PageID # 225)

The United States argues that Woodford and Kelly smelled marijuana and saw the marijuana blunt in plain view, giving them probable cause to search the car. (D.N. 50, PageID # 203) In addition, the government argues that the totality of the circumstances including "[o]dd behavior, providing a false name, lack of [a] social security number, obstructing the view of the officer, claims of police harassment, a marijuana blunt in plain view, [and] refusal to comply with simple police commands to exit the vehicle" provided adequate probable cause to search Matthews's car. (*Id.*) The government contends that the "incriminating character" of the marijuana was immediately apparent to Woodford, and Woodford testified that he could smell the marijuana after he returned to the driver's side of Matthews's car. (*Id.*, PageID # 204) In addition to having probable cause under the plain-view exception, the government maintains that once Woodford smelled the odor of marijuana, he had probable cause to extend the traffic stop to search the vehicle for drugs under the automobile exception. (*Id.*)

Matthews can only be contesting the admission of the weapon into evidence, however, as the relevant charge against him for purposes of this motion to suppress is the felon in possession of a firearm charge. But, the weapon itself was not visible to the officers as they stood outside the vehicle, and Kelly only discovered it once he had access to the interior of the vehicle. As such, the plain-view exception only justifies the seizure of the weapon if the officers had lawful access

to the interior of the car under an exception to the warrant requirement. *United States v. Hicks*, 190 F. Supp. 3d 733, 744 (S.D. Ohio 2016).

### a. Automobile Exception

Once the officers saw and smelled marijuana, they had probable cause to search Matthews's vehicle for drugs under the automobile exception to the warrant requirement. "The automobile exception allows a warrantless search of an automobile if officers have probable cause to believe the vehicle contains evidence of a crime." *United States v. Galaviz*, 645 F.3d 347, 357 (6th Cir. 2011). A marijuana blunt observed in plain sight *or the smell of marijuana* may provide probable cause to search a vehicle. *See United States v. Ivey*, 307 F. App'x 941, 942-43 (6th Cir. 2009) (per curiam) (finding no Fourth Amendment violation where the officer's plain-view discovery of marijuana on defendant provided probable cause for defendant's arrest and vehicle search) (emphasis added); *United States v. Elkins*, 300 F.3d 638, 658 (6th Cir. 2002) ("[A]n officer's detection of the smell of marijuana in an automobile can by itself establish probable cause for a search."); *United States v. Dixon*, No. 1:12 CR 69, 2013 U.S. Dist. LEXIS 104969, at *9 (N.D. Ohio July 26, 2013) (citing *United States v. Burnett*, 791 F.2d 64, 67 (6th Cir. 1986) (finding probable cause to search entire automobile existed when officer observed narcotics in plain view on the floorboard)).

Here, the scent of marijuana and the sight of what appeared to be a marijuana cigar in the ashtray provided probable cause to justify a search of the entire vehicle. *See California v. Acevedo*, 500 U.S. 565, 570 (1991) (recognizing *United States v. Ross*, 456 U.S. 798 (1982), as allowing a "'probing search' of compartments and containers within the automobile so long as the search is supported by probable cause"); *United States v. Bailey*, 407 F. App'x 27, 28-29 (6th Cir. 2011) (finding that the automobile exception applied when the smell of marijuana provided probable

cause to initially search the car, and marijuana was found on the floorboard); *Burnett*, 791 F.2d at 67 (holding that an officer "had every right to search the passenger area of the car, the trunk, and any and all containers which might conceal contraband" after discovering a small bag of marijuana on the floor of the car).  Matthews argues that the officers had no reason to believe the cigar contained marijuana because they did not test it or unwrap the cigar, and because there was no odor of marijuana.  (D.N. 51, PageID # 225)  The Court finds, however, that Woodford had probable cause to believe the object in the ashtray was a marijuana blunt "based on objective facts such as its appearance and [the] defendant's suspicious conduct."  *United States v. Massenberg*, No. 4:11-CR-4-FL, 2011 U.S. Dist. LEXIS 92744, at *18 (E.D.N.C. July 19, 2011).

As to the appearance of the item, Woodford testified that he had experience with pulling individuals over for marijuana stops.  (D.N. 47, PageID # 108)  He testified that a blunt looks very similar to a cigar or cigarillo, and that oftentimes a marijuana blunt is a cigar that has been "gutted and then re-rolled with marijuana in it."  (*Id.*)  In examining a photograph of the blunt during the evidentiary hearing, Woodford explained that the blunt found in Matthews's vehicle looked different than a regular cigar because it was "rewrapped" and "scrunched together."  (*Id.*, PageID # 119)  Moreover, Matthews himself referred to the item as a "blunt" several times during his interaction with the officers.  (*See* D.N. 49-10, 10:37, 12:47, 12:54)

As to Matthews's suspicious conduct, Woodford testified that if he had been more experienced at the time, he would have immediately removed Matthews from the vehicle because of Matthews's "furtive movement[s] and behavior from the very beginning of the stop," as well as Matthews's agitation.  (D.N. 47, PageID # 118)  Further suspicious behavior included the fact that Matthews turned his body at an odd angle when the officers approached, and Woodford testified

that he originally thought Matthews was trying to block the marijuana, though he later realized Matthews was likely trying to block the gun. (*Id.*)

Despite Matthews's argument that the search was invalid because Woodford and Kelly failed to "verify" that the object contained marijuana, the officers "did not need *proof* that the object was a marijuana blunt to seize it; [they] needed only a 'fair probability' that it was contraband." *Massenberg*, 2011 U.S. Dist. LEXIS 92744, at *18 (citing *Illinois v. Gates*, 462 U.S. 213, 238 (1983); *Texas v. Brown*, 460 U.S. 730, 742 (1983) ("[Probable cause] does not demand any showing that [the officer's] belief be correct or more likely true than false")). Based on the officers' experience with marijuana stops and the similarities between a cigar and a blunt, the Court finds that the officers had probable cause to believe the object they observed from their vantage point outside of Matthews's vehicle was a marijuana blunt. *See id.* at *17. Woodford also testified that it was not standard practice to test marijuana in the lab. (D.N. 47, PageID # 120) Although Matthews argues that the object was a cigar containing no contraband, "probable cause does not require absolute certainty." *United States v. Lewis*, 615 F. App'x 332, 337 (6th Cir. 2015); *see also Illinois v. Rodriguez*, 497 U.S. 177, 196 (1990) (noting that "the possibility of factual error is built into the probable cause standard" and that the Supreme Court has confirmed before "the unremarkable proposition that police need only probable cause, not absolute certainty, to justify the arrest"). Despite his present arguments, as explained above, Matthews referred to the item as "a blunt" several times during the traffic stop. (*See* D.N. 49-10, 10:37, 12:47, 12:54)

Although Matthews insinuates that the officers did not smell marijuana (D.N. 51, PageID # 219-20), the Court finds that Officer Woodford testified credibly about detecting the odor of marijuana. Woodford testified that he was familiar with the very distinctive and strong odor of marijuana because the officers had been trained on the smell since the middle of the academy.

(D.N. 47, PageID # 108)  He explained that a test burning was done at the academy so officers would be familiar with the smell of marijuana both burnt and unburnt.  (*Id.*)  He stated that the blunt in Matthews's car had actually been burned, so it had both the distinct odor of the burn and of the "non-burn."  (*Id.*, PageID # 109)  Woodford also stated in his arrest report that he smelled marijuana.  (D.N. 47, PageID # 109)  Even if Woodford did not have any training or experience with the smell of marijuana, the Sixth Circuit does not require an officer marijuana claiming to have smelled burnt marijuana to show that he had particular training and experience in detecting marijuana.  *United States v. McCaster*, 446 F. App'x 443, 446 (6th Cir. 2011).

The Court finds Woodford's testimony that he smelled the marijuana the second time he approached the vehicle to be credible.  Woodford testified that he did not smell the marijuana the first time he approached the vehicle because he was not close enough due to the way Matthews was leaning out of the window.  (*Id.*)  He explained that he was able to smell the marijuana the second time he approached the vehicle because he was very close to the blunt when he leaned in to remove Matthews from the vehicle.  (*Id.*)  Woodford also noted that although the officers did not unwrap the blunt, the marijuana could be smelled through the paper.  (*Id.*, PageID # 131)  Matthews draws attention to the fact that Kelly put the blunt up to his nose after Matthews asked the officers to "open it up" because there was "tobacco in there."  (D.N. 49-10, 14:13-19)  However, Matthews cites to no case law and provided no testimony to support his insinuation that Officer Kelly putting the blunt "within inches" of his nose meant the officers could not have smelled the marijuana earlier.  (*See* D.N. 47, PageID # 133)  In sum, the Court finds Woodford's testimony that he and his partner smelled marijuana when they approached Matthews's vehicle to be credible.  Because the officers smelled marijuana and believed they saw a marijuana blunt, they had probable cause to believe the vehicle contained evidence of a drug crime.  *See Bailey*, 407 F.

App'x at 28-29. Accordingly, the search of Matthews's vehicle was valid under the automobile exception. *See Arizona v. Gant*, 556 U.S. 332, 341-42 (2009).

### b. **Plain View**

The Supreme Court requires that three conditions be satisfied in order to uphold a warrantless seizure under the plain-view exception:

> (1) the seizing officer must not have violated the Fourth Amendment in "arriving at the place from which the evidence could be plainly viewed"; (2) the item must not only be in plain sight, but "its incriminating character must also be immediately apparent"; and (3) the officer must lawfully be located in a place from which the object can be plainly seen, and he must also have a lawful right of access to the object itself.

*United States v. Hunter*, 333 F. App'x 920, 925 (6th Cir. 2009) (quoting *Horton v. California*, 496 U.S. 128, 136-37 (1990)). "Once an officer has probable cause to search a vehicle under the automobile exception, evidence found may be seized pursuant to the plain[-]view doctrine." *Hicks*, 190 F. Supp. 3d at 744 (citing *Brown*, 460 U.S. at 744). "In other words, plain view provides grounds for seizure of an item when an officer's access to an object has some prior justification under the Fourth Amendment." *Id.* (internal quotations and citations omitted); *see also Galaviz*, 645 F.3d at 357 (citing *Boone v. Spurgess*, 385 F.3d 923, 928 (6th Cir. 2004)) ("The right to search the interior of the vehicle under the automobile exception provide[s] officers with a lawful right of access to the car sufficient to satisfy the plain-view exception.")).

Once the search was justified under the automobile exception, the plain-view doctrine justified the seizure of the firearm discovered during the search. *Hicks*, 190 F. Supp. 3d at 745 (citing *Acevedo*, 500 U.S. at 570); *see also Brown*, 460 U.S. at 739 (explaining that "'plain view' is perhaps better understood, therefore, not as an independent "exception" to the Warrant Clause, but simply as an extension of whatever the prior justification for an officer's 'access to an object' may be."). Specifically, the plain-view doctrine justified the seizure because Officer Kelly (1)

could see the firearm in plain view under the seat; (2) as explained above, Kelly was legally present at the location from which he plainly saw the firearm because the April 6, 2018 stop was valid; (3) the incriminating nature of the firearm was immediately apparent; and (4) the automobile exception gave Kelly a right to access the firearm. *See Hunter*, 333 F. App'x at 925. Accordingly, the search of the vehicle and the seizure of the firearm on April 6, 2018, was valid.

## II. December 9, 2018, Traffic Stop

Detectives Beau Gadegaard and Curt Flynn of the LMPD's Ninth Mobile Division were patrolling the California neighborhood of Louisville on December 9, 2018. (D.N. 47, PageID # 100) They observed a white car leave a gas station at the corner of Dixie Highway and Garland Avenue and turn northbound into an apartment complex without using its turn signal. (*Id.*) The officers did not immediately initiate a traffic stop, instead parking across the street while Gadegaard radioed for more officers so they had "more numbers to investigate." (*Id.*, PageID # 142) As they waited for backup, Gadegaard and Flynn observed the white car as it sat in the apartment complex parking lot. (*Id.*, PageID # 100) They saw "no trespassing" signs at the complex and noted that the car was parked irregularly, between two parking spots. (*Id.*) As part of their surveillance, Flynn used his binoculars to watch the passengers inside the car through the front windshield. (*Id.*, PageID # 100-01) The officers ultimately surveilled the car and its passengers for about five to ten minutes before two other LMPD officers—including Sergeant Kevin Casper—arrived at the complex. (*Id.*, PageID # 141-42)

Casper approached the white car from the driver's side and noticed that the windows had a black covering or tint obstructing his view inside the vehicle. (*Id.*, PageID # 101, 181; D.N. 49-28, 00:30-35) Casper instructed the driver to roll down his window, but the driver opened his door a few inches instead. (D.N. 49-28, 00:36-38) At the same time, Casper remarked that he still

could not see anything  (*id.*, 00:38)  and opened the car door wider.  (*Id.*, 00:42)  By this point, Gadegaard and Flynn had joined the other officers outside the vehicle.  (D.N. 49-26, 00:36-52) Gadegaard testified that as they were approaching, they saw the driver of the vehicle—Defendant Garrick Matthews—make a motion to his left side and the left side of the door.  (D.N. 47, PageID # 143)

The officers asked Matthews to get out of the car several times, but he refused.  (D.N. 49-28, 00:42-1:15)  After Matthews refused, Gadegaard and Casper removed him from the car.  (D.N. 49-26, 1:20-24)  Matthews was out of the car with one handcuff on when Gadegaard yelled out "10-38." [4]  (D.N. 49-28, 01:34)  Gadegaard whispered to the officer nearest him that the gun was "under the seat." (D.N. 48-26, 01:50)  Gadegaard testified that standing outside of the door frame, he could see the gun tucked under the driver's seat with the handle facing upwards, as though Matthews had stowed it there recently.  (D.N. 47, PageID # 145)

Once Matthews was fully restrained, Gadegaard asked him whether he had only one gun in the car, and Matthews answered affirmatively.  (D.N. 49-26, 01:54-58)  Gadegaard then asked Matthews whether he had a concealed carry license, to which Matthews responded "yes."  (*Id.*, 01:59-2:04)  When officers inquired where the concealed carry license was, however, Matthews responded, "I mean, I don't have a concealed license."  (*Id.*, 02:05)  Once the officers finished their initial inquiry about the weapon, Gadegaard informed Matthews that he did not use his turn signal when he pulled into the complex.  (*Id.*, 02:20-35)  Casper then began searching the vehicle and pulled a black and silver gun out from underneath the driver's seat.  (D.N. 49-28, 02:41-49)

---

[4] Gadegaard explained at the hearing that "10-38" is a code to let other officers know that a gun is readily accessible next to a suspect.  (D.N. 47, PageID # 146)  Gadegaard testified that he waited to yell out the code because Matthews was not "completely placed in handcuffs yet, so he still had access to the weapon."  (*Id.*, PageID # 146)

The other officers checked Matthews's identity, discovering that he was a convicted felon after submitting his information into the CourtNet system. (D.N. 49-26, 04:49-51; D.N. 47, PageID # 170) After the search was completed, Matthews told the officers that he did not know the gun was in the car. (D.N. 49-26, 16:34) Gadegaard responded that anyone could "clearly see the gun when you open the door." (*Id.*, 17:00)

Matthews now argues that the December 9 stop was pretextual because Gadegaard observed no illegal activity in the parking lot during the time he watched the vehicle but still radioed for other officers to come to the scene and assist with the "investigation." (D.N. 51, PageID # 226) Matthews contends that the "investigation" that followed his failure to use a turn signal was actually for drug activity and violent crime and had nothing to do with the alleged traffic violation, as nothing was actually done to enforce the traffic laws for that violation. (*Id.*, PageID # 226, 229) Matthews also argues that the search of the car was unreasonable because he had no access to the vehicle. (*Id.*, PageID # 228) He further contends that the police did not have any evidence of a crime, as it was unknown that Matthews was a convicted felon and the gun was allegedly visible by the plain view of an officer. (*Id.*) He notes that the officers had already begun searching the car by the time they discovered that he was a convicted felon. (*Id.*)

The government contends that the officers had the right to stop the car because there was probable cause to believe that a traffic violation occurred, and that a five-to-ten minute delay between a violation and the eventual stop is not unreasonable. (D.N. 50, PageID # 210) The government maintains that during that gap Gadegaard and Flynn were investigating and waiting for other officers to arrive, and that there is no reason why the officers' decision "to conduct a discrete surveillance operation prior to engaging in a perfectly legitimate traffic stop should alone render that stop unreasonable." (*Id.*, PageID # 210-11) As to the search, the government asserts

that the officers had probable cause to seize the gun because it was an illegally concealed weapon. (*Id.*, PageID # 212)  Alternatively, it argues that even if there was no concealed-weapon violation, the inevitable-discovery doctrine provides an exception to the warrant requirement.  (*Id.*, PageID # 214)

## A.  Probable Cause to Stop

Matthews argues that the December 9, 2018 stop was pretextual and violated his right to due process.  (D.N. 51, PageID # 226)  Matthews contends that: "random traffic stops concentrated in 'high crime areas' are a self-fulfilling prophecy that target poor and minority communities" (*id.*); the only "crime" evident to the officers was the fact that he was a "black man traveling/parked in what the police considered to be the wrong part of town"; and that the officers provided a false basis for his stop as part of a systematic targeting of a certain area of Louisville.  (*Id.*, PageID # 227)  He also asserts that nothing was done with regard to enforcing the traffic laws for his failure to signal, and that the officers instead conducted an investigation of drug activity and violent crime "without a basis in fact."  (*Id.*, PageID # 229)  The government argues that the officers had probable cause for a traffic stop because Gadegaard and Flynn witnessed Matthews fail to signal when he turned into the apartment complex, and Kentucky law "require[s] a turn signal be provided upon a vehicle moving right or left upon a roadway."  Ky. Rev. Stat. § 189.380(1)-(2).  (D.N. 50, PageID # 210)

A traffic stop's legality hinges upon "the validity of the officers' objective explanation for making the stop, not on the subjective intentions of the officers in initiating the stop."  *Herbin*, 343 F.3d at 809.  "A traffic stop supported by probable cause . . . may not be invalidated under the Fourth (and Fourteenth) Amendment on the ground that the officers stopped the car for "pretextual" reasons . . . ."  *Id.*  Further, "[a] driver's failure to use a turn signal provides probable

cause to justify a traffic stop irrespective of the officer's subjective intent." *United States v. Jackson*, 682 F.3d 448, 453 (6th Cir. 2012) (citing *Whren*, 517 U.S. at 819 (holding that a vehicle was properly stopped for, inter alia, failure to signal in violation of a District of Columbia traffic code)); *United States v. Ware*, No. 09-4419, 2012 U.S. App. LEXIS 4425, at *5 (6th Cir. Mar. 1, 2012) (unpublished) ("[T]he district court determined that the detectives had probable cause to stop the car when Ware committed a traffic violation by turning right without using a turn signal. Because probable cause existed for the traffic stop, the district court correctly held that the officers' subjective or pretextual motivation was not relevant under *Whren*."); *United States v. Miller*, 413 F. App'x 841, 843 (6th Cir. 2011) ("[E]ven if [the officer] used the failure to signal as a pretext to initiate a traffic stop of an otherwise-suspicious vehicle, this fact does not undermine the probable cause that existed to make the stop if [the defendant] failed to signal his turn.").

As the case law makes clear, the officers had an appropriate basis for the stop regardless their subjective motives because Gadegaard and Flynn observed Matthews turn into the apartment complex without activating his turn signal in violation of Kentucky law. *See Jackson*, 682 F.3d at 453; *see also* Ky. Rev. Stat. §§ 189.380(1)-(2). Moreover, Matthews does not offer, and the Court cannot find, "[any] authority that officers were required to act immediately to stop him. Their visual surveillance of him did not trigger his Fourth Amendment rights because he had no expectation of privacy in activities conducted in plain view." *United States v. Anderson*, No. 1:09-CR-195-03, 2010 U.S. Dist. LEXIS 72039, at *10 (W.D. Mich. July 19, 2010). Although Matthews correctly notes that *Anderson* involved a license-plate violation rather than a turn-signal violation (D.N. 51, PageID # 229), this distinction does not undermine its relevance to the present case or the Court's finding that a five-to-ten minute delay before commencing a traffic stop is not

unreasonable.  "Thus, the initial stop was valid, and the officers' delay in stopping [Matthews] did not violate his Fourth Amendment rights."  *Anderson*, 2010 U.S. Dist. LEXIS 72039, at *10.

## B.  Probable Cause to Search Vehicle

Matthews also challenges the legality of the search of the vehicle he was driving on December 9, 2018.  He argues that the police had no reason to believe the vehicle contained evidence of the offense of arrest or that Matthews had access to the gun discovered.  (D.N. 51, PageID # 227-28)  Matthews also contends that the police had no evidence of a crime, as it was unknown that he was a convicted felon, and "the gun was allegedly visible by the plain view of an officer." (*Id.*, PageID # 228)  The government argues that the gun was discovered in plain view because the officers were able to clearly identify the object protruding from beneath the driver's seat as part of a handgun.  (D.N. 50, PageID # 211)  Alternatively, the government argues that the officers had probable cause to seize the gun because it was an illegally concealed weapon, as Matthews did not have a concealed-carry permit.  (*Id.*, PageID # 212)  The government noted that the officers did not search the car and seize the weapon until after Matthews admitted he did not have a permit.  (*Id.*)  Finally, the government argues that even assuming no concealed-weapon violation, the plain-view discovery of the firearm coupled with the inevitable discovery of Matthews's felony provided an exception to the warrant requirement under the inevitable-discovery doctrine.  (*Id.*, PageID # 214)

While Matthews opened the door partway himself, Casper testified that he opened the door wider.  (D.N. 47, PageID # 183)  Casper opening the door of the vehicle constituted a search.  *United States v. Bradley*, No. 5:19-cr-7-TBR, 2019 U.S. Dist. LEXIS 155001, at *4-*5 (W.D. Ky. Sept. 11, 2019).  As such, the Court must determine whether an exception to the warrant

requirement applies to the opening of the car door before addressing the parties' arguments. The Court finds that a concern for officer safety justifies the opening of the car door.

### a. Officer Safety

When determining if a warrantless search or seizure following a stop was justified by a fear for officer safety, the Court must ask "whether a reasonably prudent man under the circumstances would be warranted in the belief that his safety or that of others was in danger." *Terry v. Ohio*, 392 U.S. 1, 27 (1968). "A concern for officer safety permits a variety of police responses in differing circumstances, including ordering a driver and passenger out of a car during a traffic stop . . . ." *United States v. Campbell*, 549 F.3d 364, 372 (6th Cir. 2008) (quoting *Bennett v. City of Eastpointe*, 410 F.3d 810, 822 (6th Cir. 2005)). The key inquiry is whether a reasonable officer in Casper's position would have believed that he or the public was at risk of harm. *Terry*, 392 U.S. at 27.

Before the door was open, the officers had reason to fear for their safety because they could not see what was occurring inside the vehicle. Casper testified that he could not see inside the vehicle because of the tint on the windows. (D.N. 47, PageID # 181) He testified that as soon as he realized he could not see inside the vehicle, he backed away to a safer position and asked the driver to roll down the window. (*Id.*) The driver did not roll down the window but instead opened the driver-side door "a matter of inches." (*Id.*, PageID # 182) Casper testified that this slight opening of the door gave him safety concerns because normally when he flashes his lights, the driver rolls down the windows and Casper is able to see the driver's hands and what is occurring inside the vehicle. (*Id.*) In addition, Gadegaard testified that they saw the driver make a motion to his left side and the driver's door as they were approaching the vehicle, which was ultimately the area in the vehicle where the officers discovered the weapon. (*Id.*, PageID # 143, 146)

Moreover, the vehicle was stopped at an apartment complex in a "high-crime area riddled with violence." (D.N. 47, PageID # 137, 179) Flynn testified that it is "arguably the most dangerous part of Kentucky, averaging between 10-15 homicides a year" with "shootings almost every day." (*Id.*, PageID # 168) Although it is true that an individual's presence in a high-crime area, in and of itself, does not establish reasonable suspicion, *see United States v. See*, 574 F.3d 309, 314 (6th Cir. 2009), the fact that Matthews was stopped in a high-crime area is entitled to some consideration when looking at the circumstances as a whole. The dark tint of the windows, the failure to comply with Casper's directive to roll down the window, and the opening of the car door while the officers were unable to see the driver's hands or what was occurring inside the vehicle would lead a reasonable officer to fear that the car's driver was potentially dangerous. Under these circumstances, Casper's quick decision to open the car door was prudent. The Court therefore finds that the opening of the car door was justified because a reasonable officer would have believed that there was a potential threat to officer safety based on the totality of the circumstances. *See Terry*, 392 U.S. at 27.

### b. Automobile Exception

Once the door was open, the search of the interior of the vehicle on December 9, 2018, was valid under the automobile exception. As explained above, "[t]he automobile exception allows a warrantless search of an automobile if officers have probable cause to believe the vehicle contains evidence of a crime." *Galaviz*, 645 F.3d at 357. Here, the weapon was illegally concealed without a permit, which gave the officers probable cause to believe Matthews's vehicle contained evidence of a crime. *See id.* Although Matthews contends that there was no evidence of a crime because the gun "was allegedly visible by the plain view of an officer" (D.N. 51, PageID # 228), the Court

disagrees. The weapon was not visible in plain view to officers until the car door was opened, and was therefore concealed up until that point.

At the time Matthews was stopped on December 9, 2018, Kentucky law provided that "[a] person [wa]s guilty of carrying a concealed weapon when he or she carrie[d] a concealed firearm or other deadly weapon on or about his or her person." Ky. Rev. Stat. § 527.020(1). It is not disputed that it was illegal to carry a concealed weapon without a concealed-carry permit in Kentucky at the time of Matthews's arrest. (D.N. 50, PageID # 212; *see* D.N. 51, PageID # 225-30) For a weapon to be concealed "on or about" someone's person, the item must be "concealed in such proximity to [the] person as to be of convenient access and within immediate physical reach." *Hix v. Commonwealth*, No. 2002-CA-935-MR, 2003 Ky. App. Unpub. LEXIS 1036, at *10 (Ky. Ct. App. June 6, 2003) (citing *Collier v. Commonwealth*, 453 S.W.2d 600, 601 (1970); *Hampton v. Commonwealth*, 78 S.W.2d 748 (1934)). "Kentucky's courts have defined concealment in an open-ended manner—'[A] weapon is generally held to be concealed when so placed that it cannot be readily seen under ordinary observation.'" *Sykes v. Commonwealth*, 550 S.W.3d 60, 64 (Ky. Ct. App. 2018) (quoting *Prince v. Commonwealth*, 277 S.W.2d 470, 472 (Ky. 1955)). A gun under the seat frame is considered a concealed weapon "on or about" the driver's person. *See Collier*, 453 S.W.2d at 601 ("In our opinion the pistol in the instant case was equally accessible, being reachable by the driver by the simple act of leaning over and putting his hand under the seat assembly; wherefore the pistol may be considered to be about the person of [the defendant] . . . ." (citing the former concealed-weapon provision, Ky. Rev. Stat. § 435.230)). "Whether the defendant intended to conceal the weapon is completely irrelevant." *Sykes*, 550 S.W.3d at 64 (citing *Hall v. Commonwealth*, 215 S.W.2d 840, 841 (Ky. 1948)).

Here, the officers were justified in believing that there could be other illegally-concealed weapons in the car, and their search of the vehicle was therefore permitted under the automobile exception. *See United States v. Pearce*, 531 F.3d 374, 381-82 (6th Cir. 2008) (finding that officer's observation of a gun magazine in plain view of the passenger-side floorboard of a car defendant had just exited meant "the police clearly had probable cause to arrest [defendant] and search his vehicle"). The gun was "about the person" of Matthews because it was readily accessible and found underneath the seat frame. *Collier*, 452 S.W.2d at 601. The gun was found in the vehicle driven by Matthews, underneath the driver's seat, between the seat and the driver-side door frame. (D.N. 47, PageID # 145). Gadegaard testified that the gun was "tucked" in an "odd place that most people wouldn't carry a gun," and that it seemed "readily accessible." (*Id.*, PageID # 146) He explained that he called out "10-38" to let his partners know that there was a gun readily accessible next to the suspect. (*Id.*) Gadegaard further testified that Matthews was within inches of the firearm when he was sitting in the car, and that he was also in proximity to the firearm as he was being removed from the vehicle. (*Id.*, PageID # 146-47)

The gun was also in a place where it could not be "readily seen under ordinary observation." *See Sykes*, 550 S.W.3d at 64. Casper could not see inside the vehicle's windows because of a significant amount of window tint. (D.N. 47, PageID # 181) He testified that the gun would not have been visible to anyone had Matthews gone through any drive-through such as a pharmacy or bank. (*Id.*, PageID # 186) Casper also stated that he believed the gun was concealed. (*Id.*) As the gun was concealed, the officers had probable cause to believe the vehicle contained evidence of the crime of carrying an illegally concealed weapon because Matthews admitted he did not have a concealed-carry permit prior to the search. (D.N. 49-26, 02:05) The officers were

therefore justified in believing that there could be other guns in the car, and the search of the vehicle was valid under the automobile exception.

## C.  Seizure of the Weapon

### a.  Plain View

The gun was validly seized because the three requirements for a valid warrantless seizure under the plain-view exception are present here.  First, the traffic stop was valid and the officers did not violate the Fourth Amendment in arriving at the place where the evidence could be plainly viewed because a fear for officer safety justified opening the car door.  *See Hunter*, 333 F. App'x at 925.  Second, the gun was in plain sight, and its incriminating character was immediately apparent to the officers.  *Id.*  Finally, as explained above, the officers were lawfully located outside the vehicle, where they could clearly see the gun underneath the driver's seat.  *Id.* Matthews does not dispute that the gun was plainly visible from outside the car.  The gun was therefore properly seized under the plain-view exception.  *See id.*; *see also Campbell*, 549 F.3d at 369 (finding that a gun was lawfully confiscated under the plain-view exception when an officer standing outside of a vehicle with its passenger-side door open could see the butt of the handgun under the passenger seat).  As explained above, finding that the gun was in plain view does not contradict the Court's earlier determination that the gun was illegally concealed, as the weapon was not in plain view until the officers opened the car door.

### b.  Officer Safety

Once the gun was in plain view, a concern for officer safety also justified the warrantless seizure of the weapon because "a reasonable officer would [have] believe[d], based on specific and articulable facts, that the weapon pose[d] an immediate threat to officer or public safety." *United States v. Bishop*, 338 F.3d 623, 628 (6th Cir. 2003).  As explained above, the officers were

in a place where they were lawfully allowed to be and were able to see the handgun plainly from outside the car once the vehicle's door was open. (D.N. 50, PageID # 206) The officers were able to see the gun situated directly beneath Matthews while he consistently refused to exit the vehicle. (*Id.*) Gadegaard and Casper testified that they could plainly see the handgun under the driver's seat when they stood outside of the open driver-side door. (*Id.*, PageID # 145, 185) Gadegaard also testified that when he approached the vehicle, Matthews was in the driver's seat within inches of the firearm, and that Matthews was also in close proximity to the firearm as he was being pulled out of the vehicle. (*Id.*, PageID # 146-47) Further, in the bodycam footage, Flynn informed Casper that where the gun was discovered was exactly where he saw the driver "digging" and making furtive movements. (D.N. 49-27, 26:31-40) The Court finds that under the circumstances, a reasonable officer would have believed that the weapon in plain view under the driver's seat posed an immediate safety threat. Thus, the warrantless seizure of the gun was justified. *See Bishop*, 338 F.3d at 628.

### c. Inevitable Seizure

Finally, the inevitable-discovery doctrine "allows unlawfully obtained evidence to be admitted at trial if the government can prove by a preponderance that the evidence inevitably would have been acquired through lawful means." *United States v. Kennedy*, 61 F.3d 494, 497 (6th Cir. 1995) (citing *Nix*, 467 U.S. at 444). Here, however, the question is not one of inevitable discovery but rather of inevitable seizure. *See United States v. Frederick*, 152 F. App'x 470, 474 (6th Cir. 2005). The Court agrees, however, that the gun would inevitably have been seized once the officers discovered that Matthews was a convicted felon.

In *Frederick*, Sergeant James Moore received a call that Frederick possessed a stolen vehicle or vehicle parts. *Id.* at 471. When he arrived at Frederick's property, he asked for

permission to look around the yard, and Frederick consented. *Id.* Moore determined that a vehicle in the yard was stolen after he looked up the vehicle's VIN and called the Tennessee Highway Patrol. *Id.* Several special agents from the Highway Patrol arrived, finding more stolen vehicles and vehicle parts. *Id.* During the search, one of the special agents entered Frederick's shed and found a rifle. *Id.* The agent picked up the weapon, determined it was loaded, and called for Moore. *Id.* When Moore arrived—accompanied by Frederick—the agent asked Frederick who owned the rifle; Frederick replied it was his. *Id.* The agent then asked Frederick if he was a convicted felon, and Frederick replied that he was. *Id.* In determining whether the seizure of the weapon was valid, the court explained that the issue before it was whether the rifle would inevitably have been seized, rather than discovered. *Id.* at 474. It noted that the officers were permitted to see the weapon, and that "no one doubt[ed] that the officers would have asked Frederick whose weapon it was once they had seen the rifle, whether they picked up the rifle initially or not." *Id.* The court said that Frederick provided no reason to believe that the encounter with officers would have unfolded differently if the officers had asked him whether he owned the weapon and whether he was a convicted felon before, rather than after, picking up the weapon. *Id.* It noted that excluding the rifle would "wholly fail[] to take into account the enormous societal cost of excluding truth in the search for truth in the administration of justice." *Id.* (citations omitted).

Here, as in *Frederick*, the gun would inevitably have been lawfully seized. The testimony established that the police would have uncovered that Matthews was a felon by following routine procedures. Flynn testified that it is routine procedure in a traffic stop to check the identities of suspects to determine if they have warrants or criminal history. (D.N. 47, PageID # 171) He explained that it is standard practice to check the driver's identity and discover if the driver has been previously convicted of a felony. (*Id.*) When Flynn checked Matthews's identity, he

discovered that Matthews had previously been convicted of a felony. (D.N. 49-26, 04:49-51) Gadegaard had only been searching the vehicle for a little over one minute before he was informed that Matthews was a felon. (*Id.*, 03:44-04:51) Because the police would inevitably have discovered that Matthews was a convicted felon after performing a routine identity check, they would have inevitably had probable cause to seize the weapon they saw underneath the driver's seat, even if they had waited until after they discovered Matthews was a convicted felon. *See Frederick*, 152 F. App'x at 474. Matthews has therefore not provided the Court with any reason to believe that the encounter on December 9, 2018, would have unfolded differently if the officers had waited to find out whether Matthews was a convicted felon before, rather than after, picking up the weapon. *Id.* Accordingly, the Court need not exclude the gun from evidence because it ultimately or inevitably would have been discovered and seized by lawful means. *See id.*; *see also Nix*, 467 U.S. at 444.

**III.**

For the reasons set forth above, the Court finds that both the stops and subsequent searches on April 6, 2018, and December 9, 2018 are constitutional. Accordingly, and the Court being otherwise sufficiently advised, it is hereby

**ORDERED** that Matthews's motion to suppress (D.N. 37) is **DENIED**.

October 31, 2019

**David J. Hale, Judge**
**United States District Court**
